IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Zita Leeson Weinshienk

Civil Action No. 09-cv-01341-ZLW

JUSTIN W. GRAY

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

    Defendant.
_____

**ORDER**
_____

Plaintiff appeals the November 7, 2008, written decision of Administrative Law Judge Richard J. Maddigan (ALJ) denying his claim for Social Security Supplemental Security Income benefits (SSI). The Appeals Council denied review (R. 1-3), and this appeal was timely filed.

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The Court has determined that the appeal can be resolved on the parties' briefing and that no oral argument is necessary.

**BACKGROUND**

    **A.    Personal History, Alleged Disability, and Filing of Claims**

Plaintiff was born on June 24, 1974. (R. 79). Plaintiff lives alone in Grand Junction, Colorado. (R. 80). Plaintiff completed the twelfth grade and two years of college, and has one daughter, who does not live with him. (R. 80, 100, 126, 140). In

1994, Plaintiff was convicted of possession of a controlled substance and sentenced to four years in the Department of Corrections. (R. 122). Plaintiff apparently served two and a half years of his sentence. (R. 122).

Plaintiff filed an SSI application on June 2, 2006, alleging that he had become disabled five years prior, on April 24, 2001. (R. 79-81).[1] Plaintiff alleges that he is disabled due to back and neck pain, depression, anxiety, and panic attacks. (R. 93).

Plaintiff's initial application was denied on December 8, 2006. (R. 40-42). Plaintiff timely filed a request for his case to be heard by an ALJ. (R. 43). After the ALJ issued an unfavorable decision on Plaintiff's application, Plaintiff filed a Request for Review by the Appeals Council, which was denied. (R. 1-9).

### B. Work History

Plaintiff's only job has been as a cement worker, which he performed on and off from 1991 until 2001. (R. 94, 121).

### C. Medical History

The following summarizes the relevant medical history supplied in the Record. On August 24, 2001, Plaintiff injured his back on the job picking up some lumber. (R. 121). Plaintiff filed a workers' compensation claim with respect to this injury, and back surgery was performed by a Dr. Gebhard on August 17, 2002 . (R. 121). Following surgery, Plaintiff complained that he continued to experience constant pain in his back

---

[1] Plaintiff apparently filed a claim for Social Security disability benefits prior to the present claim (see R. 123); however, during the September 11, 2006, consultative examination he told psychologist Larry L. Barnett, Ph.D. that this was his first application for benefits. (R. 138).

2

and neck, as well as migraine headaches. (R. 121). Plaintiff's workers' compensation doctor referred Plaintiff to psychiatrist Gerd Leopoldt, M.D. because he suspected that Plaintiff was depressed. (R. 126). In 2003, Dr. Leopoldt in turn referred Plaintiff to psychologist Larry L. Barnett, Ph.D. (R. 121). Plaintiff first saw Dr. Barnett on October 23, 2003. Plaintiff told Dr. Barnett that he was very frustrated with the workers' compensation process. (R. 121). He stated that he regarded himself as depressed and complained of anxiety attacks, and said that he was in need of "a place to vent." (R. 122-123). He reported that he was currently taking Prozac, clonazepam, and Ambien. (R. 121). Dr. Barnett observed that Plaintiff "expressed much frustration and anger about his current situation." (R. 123). However, according to Dr. Barnett, Plaintiff's affect appeared appropriate to thought content, and there was no evidence of hallucination or delusion, or of major thought disorder. (R. 123). Dr. Barnett made the initial and provisional diagnosis of "major depressive disorder." (R. 123).

Plaintiff saw Dr. Barnett regularly until March 16, 2004. (R. 112-123). During his treatment of Plaintiff, Dr. Barnett reported that Plaintiff continued to complain of pain in his neck and frustration with the workers' compensation process and his workers' compensation attorney. (R. 112-123). He expressed worry about whether he would be able to work in the future due to his pain and discomfort. (R. 114). Plaintiff reported to Dr. Barnett on March 16, 2004, that his medications were no longer being paid for, and that he still had a great deal of pain in his neck, "though he was able to recreate and said that he played golf today." (R. 112).

On April 28, 2005, Plaintiff went to the Marillac Clinic to have a mole removed. (R. 133). The clinic report states that Plaintiff "reports the naproxen is working pretty well for his pain. He continues to play semi-pro football." (R. 133).

Plaintiff saw Dr. Leopoldt on June 21, 2005, who reported that Plaintiff has been doing fairly well from a psychiatric standpoint." (R. 127). He stated that Plaintiff's "[a]ffect remains bright, mood euthymic." (R. 127). His assessment was "Major Depressive Disorder due to chronic pain and disability from on-the-job Injury, responding." (R. 127). He prescribed clonasepam, and continued Ambien and fluoxetine. (R. 127). On September 21, 2005, Dr. Leopoldt noted that Plaintiff "has become more irritable and distressed and at times agitated since I last saw him. He noted that he is no longer able to afford all the pysychotropic medication and therefore stopped the fluoxetine and is actually only taking clonazepam . . . . He is having increasing financial problems as well." (R. 126). Dr. Leopoldt observed "[a]ffect intense, mood dysphoric." His assessment was "Major Depressive Disorder due to chronic pain and disability from on-the-job injury, recent worsening." (R. 126). Dr. Leopoldt prescribed Lexapro because Plaintiff could not afford the fluoxetine, providing four weeks of Lexapro samples, and increased Plaintiff's clonasepam dosage.

On September 11, 2006, Dr. Barnett performed a consultative examination of Plaintiff at the request of the Social Security Administration. (R. 138-144). Dr. Barnett conducted a diagnostic interview and mental status exam, and reviewed the records provided by Social Security. (R. 138). Dr. Barnett concluded that Plaintiff

4

> is able to maintain a normal conversation but it is focused on his health problems. His irritability has led to alienation from people who were formerly friends. It has also lead [sic] to difficulties with family members. He has some difficulty dealing with authority. He has enjoyed friendships in the past but has not been able to do so recently because of the difficulties mentioned above. He is not viewed as manipulative and is not necessarily socially awkward.
>
> He is able to follow simple instructions. His concentration, persistence, and pace are impaired because of extremely low energy and very limited physical stamina. He appears to be extremely restless, irritable and has difficulty with concentrating. He described episodes of anxiety which sound like panic attacks. His speed of functioning is indeed impaired. His performance is very inconsistent.
>
> He has not decompensated to the point that he required hospitalization because of psychological difficulties. He does not do well under stress. He becomes very irritable and has major problems with personal relationships.

(R. 143). Plaintiff stated that he experiences intense feelings of anger and anxiety, low energy and fatigue, and sleep disturbance. (R. 141). Dr. Barnett noted that Plaintiff is able to drive a car, that he cooks simple meals, and that he keeps busy doing errands. (R. 139, 143). Plaintiff reported that he sometimes visits friends or his mother, though he does not have many friends, and that he watches TV a good deal. (R. 139). Dr. Barnett's diagnosis included "[m]ajor depressive episode; severe without psychotic features (directly related to injury which occurred while on the job and complications since that time)," and "[o]rthopedic difficulties with chronic pain . . . ." (R. 143). He

5

assessed Plaintiff with a Global Assessment of Functioning (GAF)[2] score of 42 (R. 144), indicating "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning, such as inability to keep a job."[3]

On October 16, 2006, James F. Dyde, MD performed a Mental Residual Functional Capacity Assessment of Plaintiff.  Dr. Dyde concluded that Plaintiff is markedly limited only in the category of understanding, remembering, and carrying out detailed instructions.  He concluded that Plaintiff is moderately limited in the categories of maintaining attention and concentration for extended periods, working in coordination with or proximity to others without being distracted by them, completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Dr. Dyde concluded that Plaintiff is not significantly limited in all other categories.  (R. 145-46).  Dr. Dyde stated as his assessment that "[m]edical evidence shows that [Plaintiff] was injured on the job which appears to be the cause of his mental status.  [Plaintiff] has the ability to perform in a work place providing that the job is light

---

[2]The GAF is a subjective rating on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed.2000) at 32.

[3]Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (internal quotation marks omitted).

6

in nature and can be learned in approx 3 months. [Plaintiff's] mental condition is not severe enough to prevent him from working. Needs limited contact with the gen. public & supervisors & co-workers." (R. 147).

On November 1, 2006, Plaintiff went to the Marillac Clinic because he was out of medication. His medications were refilled, although the clinic Progress Note states that Plaintiff did not exhibit significant signs of anxiety or depression. (R. 209). The Progress Note also states that Plaintiff's chart indicates "no narcotic refills." (R. 209).

On November 10, 2006, Bret Barney, MD performed a consultative physical examination of Plaintiff. Plaintiff's height was measured at 6 feet and his weight was 270 pounds. (R. 165). Dr. Barney diagnosed:

> 1. Degenerative disk disease, lumbosacral spine with history of lumbar effusion surgery. There is no obvious residual spinal deformity or tenderness. There are only modest limitations in range of motion and mobility.
>
> 2. History of neck pain. Again, there was no obvious cervical spine tenderness or deformity. There are no significant limitations to range of motion or observed mobility.

(R. 167). Dr. Barney opined that Plaintiff could stand or walk six hours in an eight-hour workday, could sit with no restrictions, carry 25 pounds frequently and 50 pounds occasionally, and could occasionally bend and stoop. He stated that Plaintiff has no manipulative limitations and no relevant visual, communicative, or workplace environmental limitations. (R. 167).

A Physical Residual Functional Capacity Assessment was performed by Alan Ketelhohn, MD on November 30, 2006. Dr. Ketelhohn stated that Plaintiff can occasionally lift 20 pounds, frequently lift 10 pounds, stand and sit six hours in an eight-hour work day, and is not limited in his ability to push and pull. (R. 173).

On January 4, 2007, Charles E. Lear, MD of the Marillac Clinic performed a review of Plaintiff's psychoactive medication. (R. 207-08). Plaintiff stated that he has been stable on his medication regimen and wished to continue with it. Dr. Lear stated that Plaintiff smiled and did not avoid eye contact, that his affect was pleasant and his mood euthymic, that his speech was clear, coherent, and appropriate, and that his thought process was generally linear and well integrated. (R. 208). Dr. Lear diagnosed Plaintiff with mood disorder, hypertension, and multiple stressors, with a GAF score of 55, which indicates "[m]oderate symptoms ... [or] moderate difficulties in social, occupational, or school functioning."[4] Dr. Lear continued Plaintiff's medications without increasing their dosages. (R. 208).

Plaintiff saw a licensed social worker at the Marillac Clinic on March 7 and April 5, 2007, reporting chronic pain and depression. (R. 201-04). The social worker recommended breathing, visualization, and meditation techniques, and noted that Plaintiff "was wondering if there are any other medications that might help." (R. 201).

On April 10, 2007, Plaintiff was seen at the Marillac Clinic by Physician's Assistant John Cain. (R. 198-200). His chief complaint was allergies. (R. 198). His

---

[4]Dray v. Astrue, 2009 WL 3821522 (10th Cir. Nov. 17, 2009) at *2 n.2 (quoting *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) ( *DSM-IV-TR* ) at 3-4).

secondary complaint was depression.  Plaintiff stated that he had been under a lot of stress lately because he was not able to work due to chronic pain.  (R. 198).  However, Cain noted that Plaintiff had not shown up for recent appointments with the licensed social worker.  (R. 198).  Plaintiff said that he was having trouble sleeping due to his pain.  (R. 198).  Plaintiff's third complaint was lower back pain.  There is no mention of neck pain in the April 10 Progress Note.  Plaintiff stated that he has been "put on some lifting restrictions," but apparently did not say by whom.  (R. 198).  Cain noted that Plaintiff is not doing any specific physical therapy for back pain.  (R. 198).  Upon examination of Plaintiff's back, Cain noted that "[e]xam does show some tenderness over the sacroiliac areas bilaterally and up into the paravertebral lumbar muscles.  I can straight leg raise him to 90 degrees in the sitting position without increased pain. . . . Range of motion of the back shows he has forward flexion to about 90 degree, side bending to about 20 degrees each way, and extension about 15 degrees. (R. 199). Cain apparently ordered an xray of Plaintiff's cervical and lumbar spine.  The cervical spine findings were normal.  The lumbar spine findings showed "[s]tatus post fusion of L5-S1," but otherwise essentially normal with "[n]o evidence of hardware failure."  (R. 195).

Plaintiff saw Physician's assistant Cain again on May 7, 2007.  His chief complaint was lower back pain.  (R. 192).  Plaintiff stated that he does get quite a bit of relief combining two tablets of tramadol with 2 tablets of naproxen, which he said "knocks me out for several hours."  (R. 192).  Cain noted that in the past Plaintiff has

9

been prone to over-medicating at will. Plaintiff also complained of pain in his left thigh. (R. 192). Plaintiff stated that he is not on any dedicated exercise program and admitted that he is not losing weight. (R. 192). Plaintiff had 45 degrees anterior flexion of his back but good side bending and extension. (R. 193). His straight leg bending was 70 degrees on the left and 80 degrees on the right. (R. 193). Cain stated, "[w]ill see the patient back monthly, and encouraged him about doing however much exercise he can in trying to get his weight down further, which I think in the long run is going to be the key to getting control of his back pain whether or not he is awarded disability." (R. 194).

Plaintiff apparently did not see Cain again until almost one year later, on April 28, 2008. (R. 189-191). Plaintiff's chief complaint at this appointment was a left ankle injury. His second and third complaints were allergies and "family history of heart disease." (R. 189). Cain stated, '[t]he patient seems equally concerned today about some early male-pattern baldness . . . and would like a prescription." (R. 189). Plaintiff stated that his depression medications '"are fairly effective," but still does not sleep well and would like to get a regular prescription of Ambien again. (R. 189). Cain stated, "[t]he patient has a history of steroid abuse, but he adamantly denies taking anything unprescribed at this time, denies any illicit drug use." (R. 190). Plaintiff's weight at the time of the exam was 279 pounds. (R. 190). Cain discussed with Plaintiff the importance of engaging in more physical activity, and gave him an information sheet apparently regarding a free two-month membership to an exercise facility. (R. 191). Cain stated that he was not in favor of Plaintiff using Ambien long term and did not

renew the prescription. (R. 191). Cain cautioned Plaintiff that he is on several different medications that can be quite sedating when taken together. (R. 190). Cain stated, "I remain concerned about whether this patient might be continuing to experiment with nonprescription medications and it might be appropriate at some point to ask for a urine drug screen." (R. 191). Cain also advised Plaintiff that "we need to see him more regularly to try to stay up with all these problems and that we cannot do a good job in one visit when he has a year's worth of problems to deal with. He agrees and will try to visit again in about two months. (R. 191).

### D. The Administrative Hearing

The administrative hearing was held on August 21, 2008. (R. 18). Plaintiff was represented by attorney Luke Brennan at the hearing. Plaintiff and Vocational Expert James Hardaway (VE) testified at the hearing.

The ALJ asked Plaintiff why he can't work. (R. 29). Plaintiff responded, "I just, I, with the physical, physically and I just have a hard time being around people and physically doing things." (R. 29). He went on, "I just have a hard time concentrating and I can get very irritable and get panicky and I'm irritable, on, on, on edge all the time." (R. 29). Plaintiff testified that he is not able to interact well with other people, and that he has to have help from someone in his family to do things like go grocery shopping. (R. 31). Plaintiff stated that he can't stand in line at the grocery checkout because he starts experiencing anxiety and feels like he's being closed in and trapped. (R. 32).

The ALJ presented the VE with the following hypothetical consistent with the findings of Dr. Ketelhohn: an individual age 31 who is "limited to a range of light work; never ladders, ropes or scaffolding; only occasionally stoop, kneel, crouch or crawl," and further consistent with the findings of Dr. Dyde, that the individual has "a marked problem dealing with detailed instructions, but could otherwise do tasks that could be learned in up to three months, and should have limited contact with supervisors, co-workers, and the general public." (R. 34). The VE testified that this person would not be able to perform Plaintiff's prior work as a cement laborer, but could perform jobs such as production assembler (34,000 jobs nationally and 680 in Colorado), and bottle line attendant (12,000 jobs nationally and 230 in Colorado). (R. 34). Upon further questioning by both Plaintiff's counsel and the ALJ, the VE reiterated that these jobs would involve only limited contact with co-workers. (R. 36). He testified that he could not say whether workers in these positions could be working closely enough to other workers such that they could talk to or distract each other, but that close proximity to co-workers was not an actual requirement of the jobs. (R. 37).

## ANALYSIS

### A. Standard of Review

When a district court reviews the Commissioner's decision to deny Social Security benefits the Court's only job is to determine whether the Commissioner's factual findings are supported by substantial evidence in the record as a whole, and

12

whether the correct legal standards were applied.[5]  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[6]  Since review is based on the record as a whole, the entire record must be examined to determine whether the evidence supporting the decision is substantial, taking "into account whatever in the record fairly detracts from its weight."[7]  However, the Court may neither reweigh the evidence nor substitute its discretion for that of the ALJ.[8]

**B.    Determination of Disability**

An individual

> shall be determined to be under a disability only if his physical or mental . . . impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.[9]

Disability requires more than the mere inability to work without pain.[10]

---

[5] Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003).

[6] Id.

[7] Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004) (quoting Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994)).

[8] White v. Massanari, 271 F.3d 1256, 1257 (10th Cir. 2001).

[9] 42 U.S.C. § 423(d)(2)(A).

[10] See Ray v. Bowen, 865 F.2d 222, 225-26 (10th Cir. 1989).

Whether a person has a "disability" supporting entitlement to Social Security benefits is determined using a five-step sequential evaluation process, which considers whether the claimant:

>(1) worked during the alleged period of disability;
>(2) has a severe impairment;
>(3) has a condition which meets or equals the severity of a listed impairment;
>(4) can return to his or her past relevant work; and
>(5) if not, whether he or she can perform other work in the national economy.[11]

If a determination can be made at any step, it is not necessary to proceed to the next step of the analysis.[12]

A severe impairment is one that "significantly limits your physical or mental ability to do basic work activities."[13] Basic work activities means "the abilities and aptitudes necessary to do most jobs."[14] This includes:

>(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>(2) Capacities for seeing, hearing, and speaking;
>(3) Understanding, carrying out, and remembering simple instructions;
>(4) Use of judgment;
>(5) Responding appropriately to supervision, co-workers and usual work situations; and

---

[11] 20 C.F.R. § 404.1520(a)(4) (2008); see Williams v. Bowen, 844 F.2d 748, 750-51 (10th Cir. 1988). The claimant bears the burden of establishing a prima facie case of disability at steps one through four. Id. at 751, n.2. If claimant is successful, the burden of proof falls on the Commissioner to establish the requirements of step five. Id. at 751.

[12] 20 C.F.R. § 404.1520(a)(4).

[13] 20 C.F.R. § 404.1520(c).

[14] 20 C.F.R. § 404.1521(b).

14

(6) Dealing with changes in a routine work setting.[15]

**C.     The ALJ's Decision**

The ALJ's written decision proceeds through all five steps of the sequential analysis. The ALJ determined that Plaintiff is not disabled as defined by the Social Security Act, and denied Plaintiff's application for SSI benefits.

At step one, the ALJ determined Plaintiff had not engaged in substantial gainful employment activity during the alleged period of disability. (R. 1).

At step two, the ALJ determined that Plaintiff has the following severe impairments: depression, anxiety, obesity, and history of lumbar fusion at L5-S1. (R. 15).

At step three, the ALJ determined that Plaintiff's impairments do not meet or equal the requirements in the Listing of Impairments in order to be considered a presumptive disability. (R. 16).

Before proceeding to step four, the ALJ was required to determine Plaintiff's "residual functional capacity" (RFC), which is his ability to perform work on a regular and continuing basis despite his impairments.[16] The ALJ stated that he "finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except never climbing ladders, ramps or scaffolds; occasionally stooping,

---

[15] Id.

[16] A claimant's RFC is his or her ability to perform work on a regular and continuing basis despite his or her impairments. 20 C.F.R. 404.1545. The ALJ must determine the claimant's RFC before proceeding to step four. 20 C.F.R. § 404.1520(a)(4).

kneeling, crouch or crawl; marked problem with dealing with detailed instructions but could otherwise do tasks that could be learned in up to 3 months; and should have limited contact with supervisors, coworkers and the public." (R. 18).

At step four, the ALJ determined that Plaintiff is not able to perform his past relevant work. (R. 21).

At step five, the ALJ determined that, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. 21).

The ALJ concluded that Plaintiff is not disabled under the Social Security Act and thus is not entitled to Social Security disability benefits. (R. 22-23).

### D. Plaintiff's Arguments

Plaintiff contends that the ALJ erred at step four in the sequential analysis by failing to analyze Plaintiff's limitations as to understanding and memory.[17] Plaintiff asserts that under 24 C.F.R. § 416.945(c), the ALJ is required to perform a "function by function" analysis of the specific mental functions of understanding and memory. 24 C.F.R. § 416.945(c) states:

> Mental abilities. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision,

---

[17]Plaintiff's Opening Brief (Doc. No. 11) at 5-6.

>coworkers, and work pressures in a work setting, may
>reduce your ability to do past work and other work.

Plaintiff offers no legal authority in support of the argument that the ALJ's decision must expressly mention and analyze each of the mental activities listed in 24 C.F.R. § 416.945(c). It is clear from the ALJ's decision that the ALJ did consider evidence of Plaintiff's abilities as to concentration and mental persistence and pace, and his ability to follow instructions and learn (R. 17). The fact that the ALJ did not mention the specific terms "understanding" and "memory" in his written decision does not constitute reversible error in this case.

Plaintiff also argues that the ALJ's decision is not supported by substantial evidence because the ALJ erroneously "ignored" Dr. Barnett's opinions contained in his September 11, 2006, consultative examination report. The ALJ did not in fact ignore the opinions of Dr. Barnett, who was both a treating and consultative physician. Rather, he gave Dr. Barnett's opinions "some weight," (R. 170) based on the facts that (1) no other examiner had noted many of the behaviors mentioned by Dr. Barnett and thus it appeared that Plaintiff was exaggerating his symptoms, (2) Plaintiff misled Dr. Barnett by telling him he had not filed a prior Social Security disability claim when in fact he had, and (3) other medical evidence did not support the extent of the limitations noted by Dr. Barnett. (R. 17). The ALJ's written decision was "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight."[18] As such, his findings were sufficient and in compliance with the applicable regulations.

Plaintiff also argues that the ALJ's decision is not supported by substantial evidence because, according to Plaintiff, the record does contain other evidence supporting Dr. Barnett's opinions. Plaintiff cites only to Dr. Lear's assignment of a GAF score of 55 to Plaintiff, which Plaintiff contends "is similar to the GAF score of 42 assigned by Dr. Barnett."[19] In fact, a GAF score of 42 and a GAF score of 55 are materially different: the score of 42 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning, such as inability to keep a job,"[20] while a score of 55 indicates "[m]oderate symptoms ... [or] moderate difficulties in social, occupational, or school functioning."[21] Dr. Lear, like Dr. Barnett, was a treating physician, and the ALJ was entitled to give significant weight to Dr. Lear's opinion. Plaintiff has not convinced the Court that the ALJ's factual findings were unsupported by substantial evidence in the record as a whole, or that the ALJ applied incorrect legal standards.

Accordingly, for the reasons set forth above, it is

---

[18]Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007) (quoting Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003)).

[19]Plaintiff's Opening Brief (Doc. No. 11) at 7.

[20]Langley, 373 F.3d at 1122 n.3 (internal quotation marks omitted).

[21]Dray, 2009 WL 3821522 at *2 n.2 (quoting *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) (*DSM-IV-TR*) at 3-4).

ORDERED that the November 7, 2008, written decision of Administrative Law Judge Richard J. Maddigan is affirmed. It is

FURTHER ORDERED that the Complaint and cause of action are dismissed with prejudice. It is

FURTHER ORDERED that the parties shall pay their own costs and attorney's fees.

DATED at Denver, Colorado, this 20th day of October, 2010.

BY THE COURT:

*[signature: Zita Leeson Weinshienk]*

ZITA LEESON WEINSHIENK, Senior Judge
United States District Court